# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Chief Judge Marcia S. Krieger

Civil Action No. 16-cv-00192-MSK-KLM

CRAIG S. ROBLEDO-VALDEZ,

      **Plaintiff,**

v.

ROBERT DICK,
JEFF LONG;
MR. PETERSON;
MR. BILDERAYA;
HENRY HIGGINS;
OFFICER CURRY;
STEPHANIE STEPHENSON;
DAN KATZENBERG;
CHARLES KIRSCHBAUM;
ADAM STRATTEN;
MR. FRANK;
HOLLIE KENNEDY; and
BENJAMIN MCLAUGHLIN,

      **Defendants.**

---

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT

---

**THIS MATTER** comes before the Court pursuant to Mr. Robledo-Valdez's Objections **(# 149)** to the Magistrate Judge's June 19, 2019 Recommendation **(# 144)** that Mr. Robledo-Valdez's claims against Defendant Adam Stratten be dismissed; and the Defendants Motion for

Summary Judgment **(# 175)**, and Mr. Robledo-Valdez's response **(# 176)**.[1]  Also pending are two

motions by Mr. Robledo-Valdez seeking injunctive relief **(# 147, 165)**.

## FACTS

The Court summarizes the pertinent allegations here (with disputed facts taken in the

light most favorable to Mr. Robledo-Valdez), elaborating in detail as appropriate in the analysis.

At all times pertinent to this matter, Mr. Robledo-Valdez was an inmate in the custody of

the Colorado Department of Corrections ("CDOC"), assigned to the Sterling Correctional

Facility ("Sterling").

On or about March 30, 2014, Mr. Robledo-Valdez was told by other inmates that he

would be physically attacked by another inmate that evening.  Mr. Robledo-Valdez attempted to

resolve the matter with a member of the Paisas, a prison gang that Mr. Robledo-Valdez believed

was behind the dispute, but he was unsuccessful.  That evening, Mr. Robledo-Valdez was

attacked by an inmate named Cordova, and a brief scuffle ensued.

Mr. Robledo-Valdez contends that he disengaged from the altercation and calmly

submitted himself to being handcuffed by another prison official.  Prison officials Benjamin

McLaughlin and Hollie Kennedy arrived on scene in response to the altercation and sprayed Mr.

Robledo-Valdez with pepper spray, even though he posed no threat at the time.  A third official,

Adam Stratten, unnecessarily used a taser on Mr. Robledo-Valdez.

Mr. Robledo-Valdez was taken to the medical unit and treated for his injuries.  There,

Stephanie Stephenson and Officer Curry provided Mr. Robledo-Valdez with bags of ice for his

injuries, but they placed salt and pepper in with the ice and poked holes in the bags, allowing the

---

[1]     The Defendants were granted an extension of time to November 12, 2019 **(# 178)** to file a
reply brief in support of their summary judgment motion, but they did not file any brief by or
even after that date.

salt- and pepper-laden melt water to drip into Mr. Robledo-Valdez's abrasions, causing him to suffer additional pain.

Mr. Robledo-Valdez was disciplined for his involvement in the March 30 altercation and served a period of disciplinary segregation. At the conclusion of his segregation, Mr. Robledo-Valdez advised Sterling Officials Robert Dick and Jeff Long that he had been told that, if he returned to his housing unit, he would be attacked again. Mr. Dick and Mr. Long nevertheless returned Mr. Robledo-Valdez to his housing unit, and shortly thereafter, on April 23, 2014, inmates named Muniz and Chino attacked Mr. Robledo-Valdez. This altercation ended abruptly when a staff member happened by. Mr. Robledo-Valdez suffered no injuries.

In May 2014, Mr. Robledo-Valdez learned that another attack was planned against him. Mr. Robledo-Valdez contacted Sterling staff and requested that he be placed in protective custody. He spent several weeks in such custody, using the time to advise various members of Sterling's staff of the problems he was having in his housing unit and his belief that he would be attacked again upon his return. Nevertheless, on or about June 11, 2014, Sterling staff returned him to his housing unit. Almost immediately, he was attacked again by Muniz and Chino, this time armed with makeshift weapons. Mr. Robledo-Valdez sustained significant injuries during this attack.

Thereafter, Mr. Robledo-Valdez was released on parole. He contends that Mr. Dick and his supervising parole officer, Dan Katzenberg, made concerted efforts to deprive Mr. Robledo-Valdez of housing and transportation vouchers, and otherwise sought to ensure that he would violate parole conditions.

Based on these facts, Mr. Robledo-Valdez filed a *pro se*[2] Amended Complaint **(# 13),** setting forth nine claims under 42 U.S.C. § 1983, with numerous sub-references. The Court discusses the nature of those claims and the Defendants named therein in more detail in its analysis. It is sufficient to note that the majority of Mr. Robledo-Valdez's claims turn on his contention that the Defendants violated his right to be free from cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution, either by using excessive force against him or by manifesting deliberate indifference to the risk that he would be physically attacked by fellow inmates. Certain claims, or portions thereof, were subsequently dismissed by Senior Judge Babcock **(# 15)** or by the undersigned **(# 41)**.

Several matters are now pending, which the Court will describe and resolve in turn.

## ANALYSIS

### A. Recommendation that claims against Defendant Stratten be dismissed

On December 21, 2018, the Magistrate Judge issued an Order to Show Cause **(# 131),** directing Mr. Robledo-Valdez to show why Defendant Stratten had not yet been served with process, despite having been added to the case on May 7, 2018. Mr. Robledo-Valdez requested an extension of time to February 28, 2019 (which was granted) and then March 18, 2019 (which was denied) to attempt to locate and serve Mr. Stratten. Ultimately, however, Mr. Robledo-Valdez neither effected service on Mr. Stratten nor responded to the Order to Show Cause. On June 10, 2019, the Magistrate Judge issued a Recommendation **(# 144)** that the Order to Show Cause be made absolute and the claims against Mr. Stratten be dismissed for failure to timely effect service under Fed. R. Civ. P. 4(m).

---

[2]      Because of Mr. Robledo-Valdez's *pro se* status, the Court construes his filings liberally. *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972).

Mr. Robledo-Valdez timely filed Objections **(# 149)** to that Recommendation, explaining that his prior inability to locate and serve Mr. Statten was the "direct result of the defendant's machinations and schemes," given that Mr. Robledo-Valdez was, once again, imprisoned in CDOC custody. Mr. Robledo-Valdez assures the Court that his mother "has access to large civilian databases as part of her employment" and that Mr. Robledo-Valdez himself is "one of the 3 highest ranking commanders of the Society of the Secret Circle[, an] organization [that] is involved in espionage, data collection, foreign commerce, [etc.]," such that he "is confident he can locate [Mr.] Stratten anywhere on earth." But he states that he was subjected to disciplinary segregation from May 18, 2018 to roughly May 18, 2019 which severely limited his ability to make phone calls and receive visitors. Mr. Robledo-Valdez also explains, at some length, how CDOC had garnished funds in his inmate trust account for various valid and invalid purposes, leaving him without sufficient funds to purchase meaningful quantities of paper, pens, and envelopes. The limited amounts of such supplies that he is able to obtain must then be allocated across numerous lawsuits that Mr. Robledo-Valdez is pursuing in various courts.

Fed. R. Civ. P. 4(m) provides that if a defendant is not served within 90 days after the complaint is filed, the court must dismiss the action without prejudice against that defendant unless the plaintiff "shows good cause for the failure." The mere fact that an inmate plaintiff has diligently searched for a location at which to serve a defendant does not "constitute good cause for repeatedly missing the service-of-process deadline." *Staples v. U.S.*, 762 Fed.Appx. 525, 531 (10th Cir. 2019). Here, Rule 4(m) required Mr. Robledo-Valdez to complete service on Mr. Stratten by early August 2018. There appears to have been some delay in the U.S. Marshal seeking a waiver of service from counsel representing Mr. Stratten, but on August 31, 2018, CDOC made clear that it was not capable of waiving service for Mr. Stratten because "Adam

Stratt[e]n is no longer a [C]DOC employee." **(# 115)**. CDOC provided Mr. Stratten's last known address **(# 117**, filed under restriction), and on September 5, 2018, this Court ordered **(#116)** the Marshal to attempt service upon Mr. Stratten at that address. On September 11, 2018, the Marshal reported that, having made 3 attempts at service and having spoken to neighbors, it concluded **(# 121)** that Mr. Stratten no longer lived at such address. It is unclear what, if anything, Mr. Robledo-Valdez did to attempt to locate Mr. Stratten thereafter because nothing is reflected in the Court's record.

On December 21, 2018, with Mr. Stratten still unserved, the Magistrate Judge entered an Order to Show Cause **(# 131)** directing him to complete service on Mr. Stratten by January 21, 2019. On that deadline, Mr. Robledo-Valdez filed a Motion for Extension of Time **(# 134)**, explaining that CDOC "prohibits prisoners from gathering information about its current and former employees," but that he had "enlisted the help of my mother and grandmother in researching he whereabouts of [Mr.] Stratten." (Mr. Robledo-Valdez proposed that the Court appoint and pay for an investigator to locate Mr. Stratten on his behalf, a request the Court rejected.) Mr. Robledo-Valdez requested "an extension of 21 days to utilize the research skills of my mother and grandmother." The Magistrate Judge granted **(# 136)** Mr. Robledo-Valdez's request, giving him until February 28, 2019 to complete service on Mr. Stratten. The Magistrate Judge also advised him that "no further extensions of time will be granted absent extraordinary circumstances."

The February 28, 2019 deadline came and went service or other action by Mr. Robledo-Valdez. On March 18, 2019, Mr. Robledo-Valdez again moved **(# 139)** for an extension of time to serve Mr. Stratten, explaining that CDOC had "shut off [his] phone account until May 16, 2019," and had removed Mr. Robledo-Valdez's private investigator (the same one he had

requested appointment of in the prior motion) from his list of eligible legal contacts. He also stated that he could not "write nor send letters because he cannot purchase stamps nor envelopes nor paper due to [CDOC] garnishing 90% of all his money." He thus concluded that he "has absolutely no way/method by which he can locate or track down [Mr.] Stratten." He requested an unspecified extension of time to complete service or, in the alternative, payment of funds to his investigator for that task. On June 10, 2019, the Magistrate Judge denied **(# 143)** that motion, finding that it was untimely (having been filed 12 days after the February 28 deadline), that Mr. Robledo-Valdez had not shown good cause for the delay to date and had not proposed any closed-ended period by which he would accomplish service, and that it is not the Court's responsibility to locate Mr. Stratten for Mr. Robledo-Valdez or to provide him funds for an investigator to do so. Contemporaneously with that order, the Magistrate Judge entered the instant Recommendation that Mr. Robledo-Valdez's claims against Mr. Stratten be dismissed.

The Court finds that Mr. Robldeo-Valdez has not shown good cause for an additional extension of time under Rule 4(m), and that dismissal of his claims against Mr. Stratten is appropriate. Mr. Robledo-Valdez was advised on multiple occasions about the need to expeditiously serve Mr. Stratten, and was given multiple extensions of time to accomplish the task. As in *Staples*, when a plaintiff has been given multiple extensions of time to accomplish service, and yet, 21 months into the case, the defendant's location remains unknown to the plaintiff and there is no basis to believe that future efforts to locate him will be any more availing, dismissal of the claims against that defendant under Rule 4(m) is appropriate. 762 Fed.Appx. at 530-31.

In his Objections, Mr. Robledo-Valdez contends that the delay in locating and serving Mr. Stratten was the result of his loss of telephone privileges between May 2018 and May 2019,

and that with those privileges restored and with the assistance of his mother or the members of the Secret Circle, he will be able to locate Mr. Stratten imminently. But Mr. Robledo-Valdez's January 2019 motion makes clear that Mr. Robledo-Valdez had already requested help from his mother at that time, loss of telephone privileges notwithstanding. One must therefore assume that his mother has long since exhausted her ability to locate Mr. Stratten.

That leaves Mr. Robledo-Valdez's ability to call upon the assistance of members of the Secret Circle to assist him in locating Mr. Stratten. Presumably, Mr. Robledo-Valdez has had the opportunity to enlist his fellow Secret Circle members for such assistance at all times since September 2018, when it became clear that Mr. Stratten would have to be found, or, at the very latest, December 2018, when the Magistrate Judge indicated an intention to dismiss the claims against Mr. Stratten if service could not be completed. Although the Court understands that Mr. Robledo-Valdez had restrictions on his ability to make telephone calls and send letters between May 2018 and May 2019, he acknowledges that he had some monthly allotment of paper and envelopes. Thus, he could have chosen to send a letter to a fellow Secret Circle member, asking for help locating Mr. Stratten (or asked his investigator do so so, to be paid for such services in the future when Mr. Robledo-Valdez can), but he either did not make such a request or the Secret Circle was similarly unable to complete the task.

The Court recognizes that, with a limited supply of envelopes and paper and an expansive stable of lawsuits requiring his attention, Mr. Robledo-Valdez must make difficult decisions about prioritizing the allocation of his limited resources. It appears that, here, Mr. Robledo-Valdez chose to prioritize other litigation tasks over promptly finding and serving Mr. Stratten. As such, Mr. Robledo-Valdez has not shown good cause for a further extension of time to serve Mr. Stratten. Moreover, the Court notes that, in the more than six months that have elapsed since

the Magistrate Judge's Recommendation, Mr. Robledo-Valdez <u>still</u> has not effected service on Mr. Stratten, despite having been freed from his telephone restrictions. Thus, there is no reason to believe that an additional extension of a few weeks will suddenly allow Mr. Robledo-Valdez to locate and serve Mr. Stratten now.

Accordingly, the Court overrules Mr. Robledo-Valdez's Objections and adopts the Magistrate Judge's Recommendation. Mr. Robledo-Valdez's claims against Mr. Stratten are dismissed for failure to serve pursuant to Rule 4(m).

**B. Defendant's Summary Judgment Motion**

The Defendants seeks summary judgment on some, but not all, of Mr. Robledo-Valdez's claims against them. The Court will address each discrete argument within that motion separately.

1. <u>Standard of review</u>

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment

motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

2. <u>Scope of the record</u>

The Court pauses at this stage to address the unorthodox contents of the record on both sides. Fed. R. Civ. P. 56(c)(1)(A) requires that parties' factual contentions in summary judgment briefing be supported by citations to attached evidentiary materials, such as "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . .,

admissions, interrogatory answers, or other materials." Such materials need not presently be in an admissible form, but the content or substance of the evidence must be such that it could ultimately be produced in an admissible form at trial. *Brown v. Perez*, 835 F.3d 1223, 1232-33 (10th Cir. 2016). Evidence that cannot ultimately be converted into an admissible form – *e.g.* hearsay statements or those for which the party proffering the evidence lacks personal knowledge – are not properly considered by the Court at the summary judgment stage.

Neither Mr. Robledo-Valdez nor the Defendants have tendered affidavits attesting to the factual contentions they present in their summary judgment briefing. Mr. Robledo-Valdez attaches no evidentiary material whatsoever to his summary judgment response, and five of the eight exhibits attached to the Defendants' motion are the Defendants responses to Mr. Robledo-Valdez's interrogatories. It is not clear to the Court that the interrogatory responses have been sworn to under penalty of perjury. Nevertheless, to avoid needlessly delaying the resolution of this case, the Court will treat each party – Mr. Robledo-Valdez and each of the Defendants for whom interrogatory responses were tendered – as having sworn to the truth of the contents of their respective filings under penalty of perjury, thereby converting each to the party's own affidavit.[3] (The Court does, of course, disregard any portion of such affidavits that are not clearly within the party's own personal knowledge.)

3. <u>Claim One</u>

With those caveats in mind, the Court turns to the Defendants' substantive arguments in support of their motion, beginning with Claim One. Claim One alleges that Mr. McLaughlin and Ms. Kennedy used excessive force against Mr. Robledo-Valdez, in violation of the Eighth

---

[3] Mr. Robledo-Valdez's Amended Complaint was sworn to under penalty of perjury by Mr. Robledo-Valdez, and thus, the Court treats it as an affidavit as well.

Amendment, by spraying him with pepper spray during the March 30, 2014 altercation. It also alleges that Ms. Stephenson and Mr. Curry used excessive force against Mr. Robledo-Valdez by mixing salt and pepper in with the ice bag they gave him, and by poking holes in that bag allowing the salt and pepper solution to leak out into his wounds, causing him additional pain.

The Eighth Amendment's protection against cruel and unusual punishments prohibits prison officials from engaging in conduct whose purpose is the wanton infliction of pain on inmates. *Hope v. Peltzer*, 536 U.S. 730, 737 (2002). To establish an Eighth Amendment claim predicated on prison officials' use of excessive force, the plaintiff must show: (i) that the amount of force applied was, objectively, harmful enough to establish a constitutional violation; and (ii) that, subjectively, the defendant applied the force "maliciously and sadistically," rather than "in a good faith effort to maintain or restore discipline." *Green v. Corrections Corp. of America*, 401 Fed.Appx. 371, 376 (10th Cir. 2010).

Turning first to the objective element, the Court does not understand Mr. McLaughlin or Ms. Kennedy to dispute that the use of pepper spray can satisfy that element. *See e.g. Norton v. City of Marietta*, 432 F.3d 1145, 1154 (10th Cir. 2005) ("pepper spray is an instrument with which prison officers wield their authority, or force, and thus its use implicates the excessive use of force"). And although the inquiry can be a fact-intensive one, depending in part upon "how long plaintiff was sprayed and whether he was adequately irrigated afterwards or left to suffer unnecessarily," the Court does not understand Mr. McLaughlin and Ms. Kennedy to assert that the amount of spray they used was so inconsequential as to prevent Mr. Robledo-Valdez from establishing the objective element. *Id.* In any event, Mr. Robledo-Valdez's version of events, which describes Mr. McLaughlin and Ms. Kennedy "emptying a whole can" of pepper spray into his eyes and face, would suffice to demonstrate a sufficiently severe application of pepper spray

as to prevent summary judgment predicated on the objective element.

Turning to the subjective element, as the Supreme Court explained in *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986), "where a prison security measure is undertaken to resolve a disturbance, as such occurred in this case . . . , the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm." That inquiry is driven by an array of factors, including the need for the application of force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, the extent of threats to the safety of inmates and staff, and the efforts made to temper the forcefulness of the response. *Id.* at 321. The Court is also mindful of the strong deference that is granted to prison administrators when seeking to quell inmate-on-inmate violence, and the admonition that courts should not "freely substitute [its] judgment for that of officials who have made a considered choice." *Id.* at 321-22. As *Whitley* warns, when considering summary judgment motions in these contexts, "courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives," and require the plaintiff to come forward with evidence that – when taken in the light most favorable to him -- "will support a reliable inference of wantonness in the infliction of pain." *Id.* at 322.

Here, there is a sharp dispute of fact between the parties as to the circumstances that caused Mr. McLaughlin and Ms. Kennedy to deploy pepper spray on March 30, 2014. According to incident reports they prepared, they observed Mr. Robledo-Valdez and another inmate in mid-fight, they "gave verbal directives to stop fighting," and that the inmates "continued to fight," requiring them to resort to pepper spray to halt the altercation. But Mr.

Robledo-Valdez's version of the events is sharply different. He contends that, when Mr. McLaughlin and Ms. Kennedy arrived on the scene, he had already ceased fighting. His Amended Complaint describes the events as follows:

> I tackled [the other inmate] through the door. . . We fell, I sat up, threw myself off him, and placed both hands behind my back, shouting "I'm not the aggressor." Officer Anthony Schneider got to me immediately and placed cuffs on me. He was calm, he knew I was a decent inmate. He said not to move. I repeated "I'm not the aggressor." I heard boots on the ground. [Mr. McLaughlin and/or Ms. Kennedy] was emptying a whole can of pepper spray in my eyes/face for no reason. I was already down and cuffed and held by Schneider.[4]

Taking Mr. Robledo-Valdez's version of events as true, which the Court must at this stage of the litigation, the altercation had ended and Mr. Robledo-Valdez was already handcuffed when Mr. McLaughlin and Ms. Kennedy first arrived and deployed the pepper spray. In such circumstances, the factfinder could conclude that Mr. McLaughlin and Ms. Kennedy's use of pepper spray on the already-handcuffed Mr. Robledo-Valdez was not for the good faith purpose of ending an altercation that had already concluded, but rather, was an act intended simply to inflict pain on Mr. Robledo-Valdez. As such, there is a genuine dispute of fact requiring trial of Mr. Robledo-Valdez's claims against Mr. McLaughlin and Ms. Kennedy. *Accord*, *Norton*, 432 F.3d at 1154.

The Court then turns to the claims against Ms. Stephenson and Mr. Curry. Whether the Court analyzes these claims as excessive force claims, as discussed above, or whether the Court treats them as claims that Ms. Stephenson and Mr. Curry were deliberately indifferent to Mr. Robledo-Valdez's serious medical needs in violation of the Eighth Amendment, the analysis is

---

[4]    In his summary judgment response, Mr. Robledo-Valdez adds that he was "prone [and] unmoving" at the time Mr. McLaughlin and Ms. Kennedy deployed the pepper spray.

essentially the same: Mr. Robledo-Valdez must show that: (i) objectively, he suffered a harm of sufficient constitutional significance (*e.g.* substantial pain), and (ii) subjectively, Ms. Stephenson and Mr. Curry acted for the specific purpose of causing Mr. Robledo-Valdez to suffer wanton pain. *See generally Colbruno v. Kessler*, 928 F.3d 1155, 1162 (10th Cir. 2019).

The precise nature of Ms. Stephenson and Mr. Curry's actions are not particularly clear from the record. Mr. Robledo-Valdez's Amended Complaint states:

> I was scheduled to receive ice for the severe swelling of my forehead due to the attack. . . Eventually, Currier . . . brought me a bag of ice. She put no pepper or salt in the bag. Nor did she fill it with holes. Stephenson and Curry DID, however. They would always put numerous holes in the bag and fill it with ice, pepper, and salt. (Stafford never did.) The scrapes and abrasions would experience searing pain as pepper/salt water leaked down my head. It would burn my skin and reactivate any [ ] pepper spray residue on my head and face. It was excruciating. This went on for 4 days in April/March.

The record from the Defendants is almost entirely silent with regard to the claims against Ms. Stephenson and Mr. Curry. The Defendants have tendered only Mr. Curry's interrogatory responses, which state that "it is standard practice to place pepper in the bags of ice to ensure the ice is used for its intended purpose. The holes are placed in the bag so the bag will not be used again." Later in his interrogatory responses, Mr. Curry also mentions that "Medical staff was aware that both the pepper and the holes in the bag were for security reasons."[5]

With such an abbreviated factual presentation by the Defendants, the Court cannot

---

[5]     The Defendants cite to a portion of Mr. Robledo-Valdez's deposition, in which he testified that he asked Mr. Curry why they poked holes in the ice bags, and Mr. Curry responded "we are told to do that . . . [b]ecause you might use the bag to suffocate yourself or to make hooch or for something inappropriate." The Defendants contend that this evidence establishes the security need for such a policy. But Mr. Robledo-Valdez's testimony on this point is simply hearsay, repeating what he was told by Mr. Curry. And Mr. Curry has not tendered an affidavit or other evidence that explains the security reasons for poking holes in the ice bags.

conclude that Ms. Stephenson and Mr. Curry are entitled to summary judgment on Mr. Robledo-Valdez's Eighth Amendment claims against them. To begin with, Mr. Curry's interrogatory responses address only the placing of <u>pepper</u> in the ice bag, but Mr. Robledo-Valdez also alleges that Mr. Curry and Ms. Stephenson placed <u>salt</u> in the bag as well. In the absence of evidence that including salt in an ice bag was a standard security protocol, this fact alone could permit the factfinder to conclude that the addition of salt to the ice bag was done for the purpose of causing Mr. Robledo-Valdez to suffer pain when salty water dripped out of the bag and into his abrasions.

Moreover, there is an apparent factual dispute as to whether there is indeed a "standard practice" of putting pepper in ice bags and poking holes in the bags: Mr. Robledo-Valdez's Amended Complaint asserts that two other staffers, Currier and Stafford, do not do so. With this limited factual information, the factfinder might conclude that the policy articulated by Mr. Curry did not actually exist or was not uniformly applied by Sterling staff, such that Ms. Stephenson and Mr. Curry had discretion to decide whether or not to put pepper in the ice bag and poke holes in it. And, assuming such discretion existed, the skeletal factual record does not reflect Ms. Stephenson and Mr. Curry's reasons for choosing to do so in Mr. Robledo-Valdez's case. Because there is a genuine dispute of fact as to whether Ms. Stephenson and Mr. Curry's actions were motivated by good faith security concerns or was done for the purpose of causing additional pain to Mr. Robledo-Valdez, their motion for summary judgment is denied.

However, the Defendants, including Ms. Stephenson and Mr. Curry, have raised the defense of qualified immunity. In such circumstances, Mr. Robledo-Valdez bears the burden of demonstrating both: (i) that he has sufficiently alleged a constitutional claim against each Defendant; and (ii) that the particular contours of that constitutional claim were "clearly

established" such that a reasonable officer would have been aware that his or her conduct violated the constitution. *McCowan v. Morales*, 945 F.3d 1276, 1281 (10th Cir. 2019). To establish the second prong – that the claim was "clearly established" – Mr. Robledo-Valdez bears the burden of citing to binding caselaw from the U.S. Supreme Court or 10th Circuit (or according to the weight of persuasive authority from other jurisdictions) recognizing the existence of such a right. *Id.* at 1284. The inquiry is not conducted "at a high level of generality"; rather, Mr. Robledo-Valdez must identify authority that recognizes the claimed right under the "particularized facts of the case," although in certain instances, the nature of the claim is so straightforward that existing precedent places the unconstitutionality of the alleged conduct "beyond debate." *Id.* at 1285 *and cases cited therein*.

The Court has no doubt that Mr. Robledo-Valdez's right to be free from being pepper sprayed while already handcuffed and calm is clearly established. The more difficult question, however, is whether there is authority clearly establishing that prison officials placing salt and pepper in medical ice bags and poking holes in those ice bags as security precautions violate the Eighth Amendment when water leaking through the holes and onto an inmate's abrasions and wounds causes the inmate to suffer additional pain. Mr. Robledo-Valdez has not cited to any such authority, and this Court's own independent research reveals none. To the contrary, in the few cases where courts have considered claims from inmates claiming that the practice of placing salt and pepper in ice bags caused them to suffer injury, courts have found that the inmate did <u>not</u> state a constitutional claim. *See e.g. Wincapaw v. County of Waukesha*, 2011 WL 2634360 (E.D.Wi. July 5, 2011) (slip op.). One court has recognized an Eighth Amendment claim where a prison official surreptitiously placed <u>soap</u> in an inmate's ice bag, and did so "kn[owing] that there was a possibility that [the inmate] would drink the bag's contents" (and, in

fact, the inmate did). *Jackson v. Kuepper*, 2018 WL 2561017 (E.D.Wi. June 4, 2018) (slip op.). But *Jackson* is not sufficiently similar to Mr. Robledo-Valdez's claims to "clearly establish" the claim he asserts against Ms. Stephenson and Mr. Curry, and in any event, *Jackson* is neither binding on this Court nor does it represent the clear weight of authority. Accordingly, the Court finds that Ms. Stephenson and Mr. Curry are entitled to qualified immunity on Mr. Robledo-Valdez's Eighth Amendment claims against them.

### 4. Claim Two

In Claim Two, Mr. Robledo-Valdez alleges that Mr. Frank exposed Mr. Robledo-Valdez to an unreasonable risk of physical attack by conducting an interview with another inmate and Mr. Robledo-Valdez in full view of other inmates, thus violating his rights under the Eighth Amendment.

The precise contours of this claim are still somewhat unclear. Cobbling together portions of Mr. Robledo-Valdez's Amended Complaint and summary judgment response, it appears to the Court that on or about March 30, Mr. Robledo-Valdez came to understand that, at dinner that evening, he would be jumped by and expected to fight another inmate named Cordova. Mr. Robledo-Valdez first attempted to address this situation by going to speak to another inmate named Talamantez, a "shot caller" who had the ability to defuse the situation. Because inmates were not permitted to "visit" each other's cells in this manner, Sterling staff prevented Mr. Robledo-Valdez from speaking to Talamantez, detained Mr. Robledo-Valdez in handcuffs, and took him to Mr. Frank's office. Mr. Robledo-Valdez then explained the situation to Mr. Frank. At this point, two versions of Mr. Robledo-Valdez's contentions begin to diverge.

In his Amended Complaint, Mr. Robledo-Valdez states that he was then "interviewed" by Mr. Frank while handcuffed and in Mr. Frank's office, albeit "in full view of all other inmates."

Mr. Frank "asked if I wanted him to bring Talamantez down to chat," but Mr. Robledo-Valdez "told him it was a bad idea because Talamantez was a high ranking gang member and was already suspicious of me." Despite Mr. Robledo-Valdez's hesitation, Mr. Frank "did it anyway. He sent 2 officers to arrest Talamantez in his cell and escort him in front of 200 inmates straight to the office where I was. This made me look like a snitch, a traitor, and a coward."

An excerpt of Mr. Robledo-Valdez's deposition characterizes this event differently. There, Mr. Robledo-Valdez explains that, after learning that he was expected to be attacked that evening:

> I did go to the office and speak to Lieutenant Frank about the incident and I told him that they wanted us to fight. I told him violence might happen today. I told him all these things. And I told him that if I refused to do this, I would be attacked. Frank asked if me speaking to Talamantez in a one-on-one would resolve the situation, and I said maybe. So Lieutenant Frank had staff pull out . . . Talamantez. They had him pulled out, they handcuffed him, then they handcuffed me, then the locked us both in the barbershop-slash-multipurpose room of the unit. . . Talemantez said, 'what's going on?'. . . And the lieutenant told him, this guy wants to speak to you in private. . . Sterling sort of had a policy [ ] where if they were aware of violence possibly happening and they could speak to the shot caller of a gang about resolving it with maybe another person so that no violence would happen, they would facilitate that.

In his summary judgment response, Mr. Robledo-Valdez posits that the better course of action would have been Mr. Frank permitting him to go to Talamantez's cell on his own to have that discussion, or that Mr. Frank "should have simply had [Mr. Robledo-Valdez] escorted to solitary confinement for his safety and to prevent violence." It is undisputed that, that evening, Mr. Robledo-Valdez was indeed involved in an altercation with Cordova.

Prison officials have a duty to protect inmates from violence at the hands of other prisoners, and an official who is deliberately indifferent to a substantial risk of serious harm to an

inmate violates the Eighth Amendment. *Benefield v. McDowell*, 241 F.3d 1267, 1270-71 (10th Cir. 2001). To establish such a claim, the plaintiff must show that: (i) objectively, he is incarcerated under conditions posing a substantial risk of serious harm; and (ii) the prison official was subjectively aware of that risk and was deliberately indifferent to it. *Id.* Among other things, it is particularly clear that "labeling an inmate a snitch . . . constitutes deliberate indifference to the safety of that inmate" (at least "if that label was communicated to other inmates and [the official doing the labeling] was aware of the obvious danger associated with a reputation as a snitch.") *Id.* at 1271.

Mr. Frank contends that Mr. Robledo-Valdez cannot establish either element of an Eighth Amendment claim under these facts. The Court agrees.

Turning first to the objective element, while it might be true that labeling an inmate as a "snitch" could satisfy the objective prong, the record does not reflect that Mr. Frank directly or implicitly labeled Mr. Robledo-Valdez as a "snitch." Rather, by Mr. Robledo-Valdez's own testimony, Mr. Frank inquired whether Mr. Robledo-Valdez wanted to speak to Talamantez to attempt to diffuse the situation, and Mr. Robledo-Valdez responded "maybe." Mr. Frank then retrieved Talamantez and allowed the two to talk. Rather than operating to identify Mr. Robledo-Valdez as a "snitch," Mr. Frank's action appears to be consistent with the Sterling "policy" Mr. Robledo-Valdez described, by which prison staff would "facilitate" a discussion between inmates if doing so might resolve a dispute that could lead to future violence. Nothing in the record suggests that, objectively, a policy of promoting discussion between inmates in order to resolve disputes presents a "substantial risk of serious harm"; if anything, the policy

appears to be intended to <u>avoid</u> disputes escalating to a point where harm results.[6]

Moreover, even if it was objectively unreasonable for Mr. Frank to arrange a meeting between Mr. Robledo-Valdez and Talamantez, Mr. Robledo-Valdez has not come forward with any evidence that would permit the factfinder to conclude that Mr. Frank did so with the subjective understanding that the manner in which he arranged that meeting posed such a risk (much less that Mr. Frank was deliberately indifferent to that understanding). *See Farmer v. Brennan,* 511 U.S. 825, 837 (1994) (defendant must both know of the facts that permit an inference of a substantial risk of harm to the plaintiff, and the defendant "must also draw that inference"). As noted above, Mr. Frank appeared to be acting to a Sterling policy that encouraged face-to-face meetings between feuding inmates. And although Mr. Robledo-Valdez's Amended Complaint suggests that Mr. Robledo-Valdez informed Mr. Frank that being seen speaking to Talamantez might be "a bad idea," Mr. Robledo-Valdez's deposition testimony is to the contrary: he told Mr. Frank that "maybe" it would be a good idea for the two inmates to speak. To the extent Mr. Robledo-Valdez argues now that Mr. Frank knew or understood that facilitating the meeting would endanger Mr. Robledo-Valdez, Mr. Robledo-Valdez offers nothing but conclusory assertions.

Accordingly, the Court finds that Mr. Frank is entitled to summary judgment on Claim

---

[6] Even if Mr. Robledo-Valdez is correct that being seem invoking such a policy causes other inmates to perceive him as a "snitch," the record does not reflect that his status as a "snitch" of this type exposed him to anything more than a hypothetical and abstract risk of future harm. The altercation with Cordova that occurred that evening was not caused by Mr. Robledo-Valdez being labeled a "snitch." By Mr. Robledo-Valdez's own admission, the causes for that altercation predated Mr. Robledo-Valdez speaking to Mr. Frank. Nor does it appear that any of the other altercations Mr. Robledo-Valdez was subsequently involved in were the result of fellow inmates attacking him for being a "snitch" for talking to Mr. Frank. Rather, all of those subsequent attacks appear to flow from the same unknown causes that led to Mr. Robledo-Valdez being attacked the first time by Cordova.

Two against him.

> 5. <u>Claim 4</u>

The parties appear to understand that Claim 4 has two components.  First, it alleges that Mr. Dick and Mr. Long violated the Eighth Amendment when they failed to protect Mr. Robledo-Valdez from the brief altercation that occurred on or about April 23, 2014.  Second, it alleges that Defendants Long, Petersen, Dick, Bilderaya, and Higgins violated the Eighth Amendment when they failed to protect Mr. Robledo-Valdez from the altercation that occurred on June 11, 2014.  This Court has previously recognized that Mr. Robledo-Valdez also purports to assert a claim against these same Defendants under the Fourteenth Amendment, although the Court has not had occasion to attempt to define the contours of that claim.

The same general Eighth Amendment analysis discussed above applies to these claims as well.  Mr. Robledo-Valdez must show that: (i) he faced an objectively-serious risk of harm, namely, a likelihood that he would be attacked by fellow inmates; and (ii) that each Defendant was subjectively aware of that risk and was nevertheless deliberately indifferent to it.  *Wilson v. Falk*, 877 F.3d 1204, 1209-10 (10th Cir. 2017).  A prison official who responds reasonably to the risk avoids Eighth Amendment liability, even if the harm – the attack on the inmate – was ultimately not averted.  *Id.* at 1210, *citing Farmer*, 511 U.S. at 844.

The record supporting the first portion of this claim – the contention that Mr. Dick and Mr. Long were deliberately indifferent to Mr. Robledo-Valdez's concerns that he would be attacked in April 2014 -- is scant.  In the Amended Complaint, Mr. Robledo-Valdez states that, on or about April 21, 2014, he was released from disciplinary segregation and told to return to his housing unit.  He "told [Mr.] Dick and [Mr.] Long that I'd received information from a few inmates stating that when I get released from [segregation], I would have to fight again."  Mr.

Dick and Mr. Long allegedly ignored Mr. Robledo-Valdez's concerns, and directed him back to his housing unit. He was briefly attacked by inmates named Muniz and Chino on April 23.

Relying solely on Mr. Robledo-Valdez's deposition testimony, Mr. Dick and Mr. Long argue that Mr. Robledo-Valdez only spoke to them "in general terms about the fact that [a gang at the prison] don't like him,"[7] The pertinent portion of that deposition reads as follows:

> . . . from going to seg[regation], I had already met both of those individuals, Dick and Long. . . Because when they investigated me for the fight with Cordova, I had told them this, this, the Paisas [gang] don't like me, et cetera, et cetera, blah blah blah. This might happen again.

Mr. Dick's response to interrogatory 2 may also be germane to this issue. That exchange reads:

> **Interrogatory 2**: Why did you repeatedly order [Mr. Robledo-Valdez to go reside in Unit 4 with his attackers or 'would-be attackers'?
>
> **Response**: Offender Robledo was assigned to [Living Unit] 4. His claims of custody issues were with the Paisa [gang]/STG [Security Threat Group], but the custody issues could not be verified. When Robledo was assaulted, it was by an offender with no STG affiliation.[8]

It appears to the Court that, objectively, there was a serious risk that Mr. Robledo-Valdez

---

[7] Mr. Dick and Mr. Long also argue that, at his deposition, Mr. Robledo-Valdez testified that "the only reason that he kept bringing [the fact that a gang didn't like him] up was because he was trying to appea[l] the prison disciplinary conviction he received for his fight with offender Cordova." This is a mischaracterization of Mr. Robledo-Valdez's deposition testimony. Mr. Robledo-Valdez testified "the whole reason I kept bringing it to [Mr. Dick and Mr. Long's] attention is because I was trying to appeal the fighting conviction between me and Cordova. I wanted to establish to staff this is an ongoing issue. This particular group of individuals continues to create violent situations for me, and I'm trying to get away from them." (Emphasis added, interstitial questions omitted).

[8] Mr. Robledo-Valdez disputes that Muniz was not affiliated with the Paisas gang, although he appears to concede that, due to negligence from higher-ups, Mr. Dick and Mr. Long might not have been aware that prison staff's information about Muniz was inaccurate.
Curiously, Mr. Bilderaya's interrogatory responses indicate that, at least as of June 11, 2014, Sterling officials believed that Muniz had an "STG -Paisas" affiliation.

would be attacked if he returned to his living unit. Mr. Robledo-Valdez stated that he was warned of that imminent attack and the attack came to pass almost immediately. Thus, the issue presented on this portion of the claim is whether Mr. Robledo-Valdez's communications to Mr. Dick and Mr. Long were sufficient to put them on subjective notice that Mr. Robldeo-Valdez faced an objectively-serious risk of harm at the hands of his fellow inmates. Courts have held that "complaints that convey only a generalized, vague, or stale concern about one's physical safety typically will not support an inference that a prison official had actual knowledge that the prisoner was in danger." *Gevas v. McLaughlin*, 798 F.3d 475, 481 (7th Cir. 2015). On the other hand, concerns stated in generalized terms might suffice where there is evidence that a risk of attack was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past." *See Blackstone v. Thompson*, 568 Fed.Appx. 82, 84 (3d Cir. 2014).

Here, the Court cannot say that, as a matter of law that the concerns Mr. Robledo-Valdez expressed to Mr. Dick and Mr. Long were insufficient to put them on notice of a risk that he would be attacked. As noted above, Mr. Robledo-Valdez correctly anticipated his first attack, giving advance notice to Mr. Frank of his concerns. Mr. Robeldo-Valdez was just emerging from disciplinary segregation related to that first attack, meaning that the next few days would be the first opportunity for an assailant to settle any business left unfinished with Mr. Robledo-Valdez in the wake of the first attack. (By contrast, if Mr. Robledo-Valdez had brought his concerns to Mr. Dick and Mr. Long after 6 months or a year of living unmolested in his housing unit, his prediction might carry less weight.) He advised Mr. Dick and Mr. Long that he had received reports from fellow inmates that a second attack was being planned. Mr. Robledo-Valdez was also specific enough to anticipate that the attack would come from within his housing unit. These facts, taken together, might suffice to demonstrate that Mr. Robledo-

Valdez's prediction of an attack was sufficiently credible to warrant consideration by Mr. Dick

and Mr. Long. Mr. Dick and Mr. Long may be correct that Mr. Robledo-Valdez predicted that

the attack would come from a Paisas member, and that Muniz may not have been such a

member, but this Court would be hard-pressed to say that, in circumstances like those presented

here, an inmate must accurately predict the specific identity of his attacker in order to state an

Eighth Amendment claim against those who ignore the inmate's warnings. *See e.g. Wilson v.

Falk*, 877 F.3d 1204, 1211 (10th Cir. 2017) (reversing grant of summary judgment, finding that

inmate's statement that "they home-boys . . .was going to get him" was sufficiently specific to

support Eighth Amendment claim against prison officials who failed to protect inmate from

attack). Accordingly, the Court denies Mr. Dick and Mr. Long's request for summary judgment

in their favor on that portion of Mr. Robledo-Valdez's Claim 4 that relates to the April 23 attack.

The second component of Claim 4 relates to Mr. Robledo-Valdez having been attacked

for a third time on or about June 11, 2014. Mr. Robledo-Valdez was warned by Muniz and

others in May 2014 that he would be attacked again. Thus, at his request, he was removed from

his housing unit and placed in protective segregation for several weeks. During that time, he

spoke with various Defendants about his situation, including Mr. Long, Mr. Petersen, Mr. Dick,

Mr. Bilderaya, and Mr. Higgins. Nevertheless, after several weeks, the Defendants advised Mr.

Robledo-Valdez that their investigation revealed no basis to believe that a future attack was

likely and they returned him to his living unit. Within a few hours of returning to the unit, Mr.

Robledo-Valdez was attacked in his cell by Muniz and Chino, sustaining serious injuries.

Mr. Bilderaya and Mr. Higgins seek summary judgment on this claim against them on the

grounds that Mr. Robledo-Valdez's claim against them "is solely based upon the filing of his

grievances."[9]  This is not a correct representation of Mr. Robledo-Valdez's testimony nor the

broader scope of his claim as related in the Amended Complaint.  As Mr. Robledo-Valdez states

in the Amended Complaint, during his period in protective segregation:

> I did get called to an office a few times to speak with various staff
> as part of CDOC's new method of handling grievances. . . I'd met
> with Major Bilderaya [and] Capt. H. Higgins . . . and a few others.
> During each interview, I told each interviewer about why I was in
> solitary confinement and why I was in fear for my life.  Though
> they were only present to discuss grievance issues, I made sure to
> let them all know.  I did this to ensure that the highest ranking
> people of the administration would all be aware that I [ ] was only
> in solitary for my protection against inmates who wanted to murder
> me.

The following exchange occurred during Mr. Robledo-Valdez's deposition:

> Q: . . . what are your allegations as to [ ] Higgins, Bilderaya? . . .
> [A]s I recall, you had mentioned – because you kept filing
> grievances during that time?
>
> A:  Yes.
>
> Q: Is that kind of what --
>
> A: What I –
>
> Q:  -- those allegations associated with those individuals related to
> those grievances?
>
> A:  Yes.

Reading these two portions of the record together, the Court does not understand Mr. Robledo-

Valdez's deposition testimony to be conceding that his claims against Mr. Bilderaya and Mr.

Higgins are based simply on the fact that those individuals read or responded to grievances Mr.

---

[9]      It is well-established that the fact that a prison official who simply reads or responds to an
inmate's grievance complaining about an alleged constitutional violation committed by others is
not deemed to have also personally participated in that constitutional deprivation.  *Requena v.
Roberts*, 893 F.3d 1195, 1216 (10th Cir. 2018), *citing Gallagher v. Shelton*, 587 F.3d 1063, 1069
(10th Cir. 2009).

Robledo-Valdez filed. Rather, it is clear that Mr. Robledo-Valdez mentions the filing of grievances as an explanation as to how he was able to obtain a personal audience with high-ranking officials like Mr. Bilderaya and Mr. Higgins, at which he was then able to specifically explain his fears of future attacks to them. Thus, the record, taken in the light most favorable to Mr. Robledo-Valdez, is that he specifically spoke to Mr. Bileraya and Mr. Higgins about the risks he faced if he were returned to his housing unit, and that Mr. Bilderaya and Mr. Higgins, despite knowing of those risks, failed to take action to address them. The misplaced argument that Mr. Robledo-Valdez's claims against Mr. Bilderaya and Mr. Higgins only relate to their involvement in reviewing grievances is the only argument that these Defendants offer in favor of their request for summary judgment,[10] and thus, the Court denies their motion.

Next, Mr. Petersen, Mr. Long, and Mr. Dick seek summary judgment on the portion of Mr. Robledo-Valdez's Claim 4 that relate to the June 2014 attack. They offer several arguments which the Court addresses in turn. First, they contend that Mr. Robledo-Valdez "cannot show that Peterson, Long, or Dick actually made the decision to have him returned to general population on June 11, 2014." But, as noted above regarding Mr. Bilderaya, the deliberate indifference analysis focuses on whether each individual Defendant failed to take reasonable

---

[10]     Mr. Bilderaya also makes a brief assertion that he "did not have any involvement in the unit assignments for Plaintiff," citing to his own interrogatory responses. The pertinent portion of his interrogatory responses address a question about why Mr. Robledo-Valdez "got ordered to live and reside in Unit 4 (again) at Sterling Prison from November 15, 2017 to May of 2016 [sic] with one of his original assailants," to which Mr. Bilderaya responded that he "did not have involvement in the unit assignment of Robledo-Valdez." It is not apparent to the Court that Mr. Bilderaya's response is addressing a broader span of time than the 2016-2017 time frame posited in the question, and nothing else in the record sheds any light on Mr. Bilderaya's response. In any event, whether or not Mr. Bilderaya was involved in unit assignments for Mr. Robledo-Valdez does not necessarily bear on the question of whether Mr. Bilderaya was deliberately indifferent to the risks that Mr. Robledo-Valdez would be attacked again. Reassigning Mr. Robledo-Valdez to a different housing unit was just one of many ways that a prison official could address the risk of a future attack.

action in response to the risks facing Mr. Robledo-Valdez, not whether a given Defendant was the final decisionmaker who directed Mr. Robledo-Valdez's return back to his living unit. Nothing in the record indicates that Mr. Petersen, Mr. Long, or Mr. Dick were without any authority whatsoever to address Mr. Robledo-Valdez's concerns about a future attack.

Second, these Defendants argue that they did respond reasonably to Mr. Robledo-Valdez's concerns, insofar as "Plaintiffs' concerns were investigated and looked into." Notably, no citation to the record is offered for this proposition, and the Court's review of the record reveals no evidentiary material that attests to the existence of any investigation into Mr. Robledo-Valdez's concerns by Mr. Petersen, Mr. Dick, or Mr. Long. Mr. Petersen's interrogatory responses seem to suggest that he lacks an independent recollection of the circumstances surrounding Mr. Robledo-Valdez's return to his housing unit in June 2014 and relies solely on his review of CDOC records, without mentioning any investigation into Mr. Robledo-Valdez's concerns. There is no evidentiary material in the record reflecting Mr. Long's position on any issue. As noted above, Mr. Dick's interrogatory responses mention simply that "none of Robledo's custody issues could be verified," but offers no explanation of the nature of any investigation that was undertaken in an attempt to verify those issues. (Mr. Dick's use of the passive voice seems to imply that, to the extent an investigation was conducted, it was not Mr. Dick who performed it.) In the absence of evidence that Mr. Petersen, Mr. Dick, or Mr. Long personally took any reasonable action to investigate or respond to Mr. Robledo-Valdez's concerns of an imminent future attack, a factfinder could conclude that each of them were deliberately indifferent to those concerns.

Finally, these Defendants argue that Mr. Robledo-Valdez's complaints to them were too generalized, amounting to "global, nonspecific fears of the Pais[as]." As discussed above, the

record reflects that Mr. Robledo-Valdez had twice warned prison staff of threats that he would be physically attacked, that both such warnings were ignored by prison staff, that the threatened attacks occurred almost immediately thereafter, and that Mr. Robledo-Valdez had been warned yet again of a third anticipated attack should he return to his housing unit. The Court finds that, in these circumstances, Mr. Robledo-Valdez's concerns were expressed to the Defendants with enough specificity to permit a trial.

Because the Court finds that Mr. Petersen, Mr. Long, and Mr. Dick's arguments for summary judgment are without merit, Claim 4 will proceed to trial against them.[11]

The Defendants also seek summary judgment on that portion of Claim 4 that purports to assert Fourteenth Amendment claims against them. The Defendants believe that such a claim necessarily arises under the Substantive Due Process Clause, but that it essentially merges with Mr. Robledo-Valdez's existing and more specific Eighth Amendment claims. *Citing Berry v. City of Muskogee*, 900 F.2d 1489, 1493-94 (10th Cir. 1990). Mr. Robledo-Valdez does not respond to this portion of the Defendants' motion. The Court finds merit in the Defendants' argument and dismisses, as redundant, Mr. Robledo-Valdez's Fourteenth Amendment claims in Claim 4.

  6. <u>Claim 6</u>

In Claim 6, Mr. Robledo-Valdez alleges that Mr. Dick purposefully disseminated a "parole action sheet," which disclosed Mr. Robledo-Valdez's convictions for sex assault on a child and stalking, to other inmates, exposing Mr. Robledo-Valdez to an increased risk of attack

---

[11]   To the extent the Defendants contend that Mr. Robledo-Valdez's Eighth Amendment failure to protect claim against them is not "clearly established," the Court disagrees. The caselaw cited in this section of the discussion suffices to demonstrate that such claims are clearly established within the scope of the facts Mr. Robledo-Valdez asserts here.

at the hands of fellow inmates.

Mr. Robledo-Valdez does not discuss this claim in his summary judgment response, and thus, the Amended Complaint is the only source of information about Mr. Robledo-Valdez's allegations. He asserts that in or about May 2014, Mr. Dick "knowingly, willfully sent [the form] to another inmate who [Mr. Dick] later claimed had a similar last name." He states that although prison staff tried to retrieve the form, "inmates passed it around to each other" and yelled that they now knew Mr. Robledo-Valdez was a sex offender and that they would kill him. Mr. Robledo-Valdez contends that Mr. Dick's actions "placed me in danger from any and all inmates who saw the sheet." The Court understands Mr. Robledo-Valdez to assert that Mr. Dick's actions constituted a violation of his Eighth Amendment rights because disclosure of Mr. Robledo-Valdez's criminal history heightened the risk that Mr. Robledo-Valdez would be attacked by other inmates.

Mr. Dick seeks summary judgment on this claim arguing that Mr. Robledo-Valdez cannot show that Mr. Dick <u>purposefully</u> distributed the sheet to other inmates. (Mr. Dick also seems to dispute that he distributed the sheet at all, beyond sending it to Mr. Robledo-Valdez himself. In this regard, Mr. Dick appears to imply that any improper dissemination of the sheet was by unspecified "living unit staff" members.)

Mr. Robledo-Valdez bears the burden of proof at trial that Mr. Dick personally participated in the improper distribution of the parole action sheet, and that he did so via a deliberate and intentional act. *See Jenkins v. Wood*, 81 F.3d 988, 994-95 (10th Cir. 1996). Conclusory allegations of personal participation are not sufficient to carry Mr. Robledo-Valdez's burden. *Id.* Here, Mr. Robledo-Valdez has not come forward with evidence that suggests that he can establish that Mr. Dick distributed the parole action sheet to other inmates, much less that he

did so purposefully.  The Court is not inclined to treat Mr. Robledo-Valdez's allegations against

Mr. Dick as facts that are within Mr. Robledo-Valdez's personal knowledge, as there is no

indication that Mr. Robledo-Valdez purports to have personally witnessed Mr. Dick handing the

sheet to another inmate.  Thus, Mr. Robledo-Valdez has not identified any non-conclusory facts

that he could produce at trial to support this claim.  Mr. Dick is therefore entitled to summary

judgment on Claim 6.

       7.  <u>Claim 8</u>

     Mr. Robledo-Valdez's final remaining claim alleges that Mr. Katzenberg, who served as

the "re-entry specialist" assigned to assist Mr. Robledo-Valdez in the early days of his parole,

purposefully acted with the intention to obstruct or frustrate that parole in various ways.  For

example, Mr. Robledo-Valdez contends that Mr. Katzenberg refused to search for housing

opportunities for Mr. Robledo-Valdez (despite the fact that maintaining a specific residence was

an essential term of Mr. Robledo-Valdez's parole), required Mr. Robledo-Valdez to appear in

person to claim housing vouchers rather than following the standard practice of e-mailing those

vouchers directly to the landlords, and refusing to provide Mr. Robledo-Valdez with adequate

numbers of bus passes that he was otherwise entitled to have.  As a result, Mr. Robledo-Valdez

was effectively rendered "homeless" for a period of 5 days before he eventually found a

residence that would accept him.  The Court has previously indicated that Mr. Robledo-Valdez

asserts an Eighth Amendment claim against Mr. Katzenberg, although the Court has not yet had

occasion to attempt to define the contours of that claim.

     Mr. Katzenberg seeks summary judgment on Claim 8 against him, arguing that, as a

factual matter, he provided various services and assistance to Mr. Robledo-Valdez.  Mr.

Katzenberg further argues that Mr. Robledo-Valdez cannot establish that Mr. Katzenberg had the

requisite "deliberately indifferent" state of mind to support an Eighth Amendment violation.  In response, Mr. Robledo-Valdez simply indicates that two witnesses would attest to the fact that Mr. Katzenberg was "forced" by his supervisors to immediately locate housing for Mr. Robledo-Valdez.  (Mr. Robledo-Valdez also makes an allegation, not found in the Amended Complaint, that Mr. Katzenberg would force Mr. Robledo-Valdez to "show him his genitals" in order to receive additional weekly housing vouchers.)

The Court has some difficulty fitting Mr. Robledo-Valdez's allegations into the Eighth Amendment paradigm.  The Supreme Court has determined that the constitution does not guarantee a convicted person will obtain release on parole, nor does it affect how a state implements a scheme of discretionary parole release.  *Greenholtz v. Inmates of Nebraska*, 442 U.S. 1, 7 (1979).  Thus, the question of whether Mr. Katzenberg offered sufficient assistance to Mr. Robledo-Valdez to make a transition to parole presents issues that are not cognizable under the Eighth Amendment.[12]  In any event, in this regard, Mr. Katzenberg's invocation of the doctrine of qualified immunity is well-taken, and Mr. Robledo-Valdez bears the burden of identifying authoritative caselaw that clearly establishes that an individual like Mr. Katzenberg can be held constitutionally liable under the Eighth Amendment for failing to tender adequate assistance to an inmate making a transition to parole.  Mr. Robledo-Valdez has not done so, and thus, Mr. Katzenberg is entitled to qualified immunity on Claim 8.

---

[12]     The Court expresses no opinion as to whether Mr. Robledo-Valdez could articulate the appropriate facts upon which to bring a colorable Procedural Due Process claim: that is, to show that state policies or regulations conferred upon him a liberty or property interest in Mr. Katzenberg's assistance or in the provision of an available housing location immediately upon his release, and that Mr. Katzenberg deprived him of that interest.  But such facts are not found within the Amended Complaint and thus, the Court does not consider such a claim now.

Accordingly, the Defendants' Motion for Summary Judgment is granted in part, insofar as Ms. Stephenson and Mr. Curry are entitled to summary judgment on Claim 1, Mr. Frank is entitled to summary judgment on Claim 2, Mr. Dick is entitled to summary judgment on Claim 6, and Mr. Katzenberg is entitled to summary judgment on Claim 8. However, Claim 1 (Eighth Amendment as against Mr. McLaughlin and, Ms. Kennedy); and Claim 4 (Eighth Amendment as against Mr. Bilderaya, Mr. Long, Mr. Dick, Mr. Higgins, and Mr. Petersen) will proceed to trial. The parties will begin preparation of a Proposed Pretrial Order and shall jointly contact chambers to schedule a Pretrial Conference.

### C. Mr. Robledo-Valdez's motions

Mr. Robledo-Valdez has filed two motions **(# 147, 165)** requesting "injunctive relief." The first motion recites a variety of complaints Mr. Robledo-Valdez has about his confinement, including the garnishment of his inmate account, but the primary thrust of the motion seems to be a complaint that CDOC has chosen to re-assign Mr. Robledo-Valdez back to Sterling, housing him in a unit where one of his prior assailants lives. Mr. Robledo-Valdez complains that there are other inmates at the facility who also have grudges against him for various reasons, further exacerbating the risk that he will be attacked again. Mr. Robledo-Valdez requests "an injunction ordering CDOC (defendants) to cease hosing him with [an inmate named Delgado who previously attacked him] and to cease placing him in Unit 4 at Sterling Prison." He also requests, more generally, that "the Court order that all defendants shall not harass, injure, threaten, or mistreat [him] in any way, to include financially." Mr. Robledo-Valdez's second motion focuses exclusively on the continuing garnishments of his inmate account and the effect they have on his ability to purchase envelopes, stamps, and other products. He requests an

injunction "preventing any garnishment in excess of 60% and order the return of $280" to his inmate account.

To be entitled to a preliminary injunction, Mr. Robledo-Valdez must show that: (i) he has a substantial likelihood of succeeding on the merits of his case; (ii) he will suffer irreparable injury if an injunction is denied; (iii) the balance of the equities tips in his favor; and (iv) the injunction is not adverse to the public interest. Because an injunction is an extraordinary remedy, he must show that his right to relief is "clear and unequivocal." *Kikumura v. Hurley,* 242 F.3d 950, 955 (10th Cir. 2001).

The Court begins by summarily rejecting Mr. Robledo-Valdez's requests for injunctions relating to garnishments from his inmate accounts. A preliminary injunction, like a permanent injunction, provides relief based on the claims that are asserted in the complaint and properly before the Court. Thus, it is the scope of Mr. Robledo-Valdez's claims in the Amended Complaint that controls the scope of preliminary injunctive relief that the Court can grant him. Mr. Robledo-Valdez's Amended Complaint challenges the various Defendants' failure to protect him from known risks of physical violence; nothing in Mr. Robledo-Valdez's claims in this case relate to garnishments from his inmate account. Thus, Mr. Robledo-Valdez cannot possibly show a likelihood of success on the merits of a claim involving garnishments because no such claim exists in this case.

As to Mr. Robledo-Valdez's request for an injunction against "CDOC" requiring him to be moved from Sterling, the Court's jurisdiction to impose an injunction is limited to the parties to this case. CDOC is not one of those parties, and thus, the Court cannot issue an injunction of this type to CDOC itself. Mr. Robledo-Valdez has not shown that any of the named Defendants in this action have the sole power and authority, if directed by the Court, to effectuate Mr.

Robledo-Valedez's transfer to another prison.  Thus, it does not appear that the Court has the authority to require Mr. Robledo-Valdez's transfer to another prison.

That leaves Mr. Robledo-Valdez's request for an injunction requiring him to be housed in a different unit than his current housing assignment in Sterling.  It is not necessarily clear to the Court that any of the Defendants in this case have the ability to independently direct a reassignment of Mr. Robledo-Valdez to another housing unit, and Mr. Robledo-Valdez has not alleged as such,  Thus, it is not clear that the injunction requested by Mr. Robledo-Valdez is even within the Court's power to grant.  But as to Mr. Robledo-Valdez's belief that he faces a risk of physical assault at the hands of inmates other than those involved in prior attacks, the Court also finds that Mr. Robledo-Valdez has not made a *prima facie* showing of an imminent injury.  In other words, his belief that he will be attacked by <u>new</u> inmates is nothing more than speculative, and not sufficient to warrant a preliminary injunction.  *See e.g. Pinson v. Pacheco*, 397 Fed.Appx. 488, 492 (10th Cir. 2010) ("we fail to see how being housed in the same correctional institution . . . as inmates with whom he has some unspecified history would pose an immediate risk of harm to Pinson").

As to Mr. Robledo-Valdez's contention that he is currently housed in the same unit and pod as one of the inmates who participated in a prior attack,[13] the Court considers whether Mr. Robledo-Valdez has demonstrated a *prima facie* entitlement to a preliminary injunction requiring the Defendants to move him to another housing unit within Sterling.  Unlike the set of facts described in the Amended Complaint, which allege that the various Defendants manifested

---

[13]     In the motion, Mr. Robledo-Valdez identifies Delgado as an inmate who previously attacked him with a sock containing a combination lock, a weapon that Mr. Robledo-Valdez previously associated with the inmate named Chino during the June 11, 2014 attack.  It is not clear to the Court whether Delgado and Chino are the same person and, if not, what attack on Mr. Robledo-Valdez Delgado is alleged to have committed.

deliberate indifference to the possibility that Mr. Robledo-Valdez would be attacked by other inmates over a span of several months in 2014, Mr. Robledo-Valdez's current motion seeking injunctive relief requires him to show a likelihood that he could succeed on an Eighth Amendment challenge to the current state of affairs in his housing unit. As discussed above, Mr. Robledo-Valdez cannot state an Eighth Amendment claim based on a generalized apprehension that someday, a fellow inmate might choose to attack him. Rather, Mr. Robledo-Valdez must point to specific facts that show an objectively-significant risk that such an attack will take place. Although the Court is troubled that Sterling staff have chosen to house Mr. Robledo-Valdez in the same unit as an inmate who previously attacked him (and violently, if Delgado is the same person as Chino), Mr. Robledo-Valdez has not alleged facts that suggest that the tense state of affairs that existed between the two men in 2014 continues to exist today in 2020. Tempers cool, grudges are settled or forgotten, and affiliations and friendships can be made or broken over time.

If Mr. Robledo-Valdez's injunction motion alleged that Delgado was continuing to threaten him with violence, the Court might be inclined to find that the present state of affairs, like that which existed in 2014, presents a likelihood that Mr. Robledo-Valdez could succeed on an Eighth Amendment claim today. This, in turn, might permit the Court to conclude that a preliminary injunction was appropriate. But Mr. Robledo-Valdez has not alleged such facts and thus, the Court concludes that he has not made the requisite showing of a likelihood of success on the merits, sufficient to support entry of a preliminary injunction.

Thus, both of Mr. Robledo-Valdez's motions are denied.

**CONCLUSION**

For the foregoing reasons, Mr. Robledo's Objections **(# 149)** are **OVERRULED**. The Court **ADOPTS** the Magistrate Judge's June 19, 2019 Recommendation **(# 144)** and **DISMISSES** Mr. Robledo-Valdez's claims against Mr. Stratten pursuant to Fed. R. Civ. P. 4(m).[14] The Court **GRANTS IN PART AND DENIES IN PART** the Defendants' Motion for Summary Judgment **(# 175)** on the terms set forth above.[15] Mr. Robledo-Valdez Motions for Injunctive Relief **(# 147, 165)** are **DENIED**.

Claims One against Mr. McLaughlin and Ms. Kennedy, and Claim Four against Mr. Bilderaya, Mr. Higgins, Mr. Dick, Mr. Long, and Mr. Petersen will proceed to trial. The parties shall promptly begin preparation of a Proposed Pretrial Order and shall jointly contact chambers to schedule a Pretrial Conference.

Dated this 29th day of January, 2020.

**BY THE COURT:**

_(signature: Marcia S. Krieger)_

Marcia S. Krieger
Senior United States District Judge

---

[14]    It appearing that there are no viable claims proceeding against Defendant Charles Kirschenbaum, he too is dismissed from this action.

[15]    The parties have not requested that this Court enter final judgment pursuant to Fed. R. Civ. P. 54(b) in favor of Defendants Stephenson, Curry, Frank, and Katzenberg. Thus, the Court does not do so at this time. The Clerk of the Court shall enter judgment in favor of these Defendants upon the conclusion of all remaining proceedings in this case.